# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JASYN SADLER,                               :
BARBARA SCULLY,                             :          NO. 3:05-CV-1189(MRK)
and ELLEN BRASSIL                           :
                                            :
                    Plaintiffs,             :
v.                                          :
                                            :
NORMAN MINETA, FEDERAL                      :
HIGHWAY ADMINISTRATION,                     :
and BRADLEY KEAZER                          :
                                            :
                    Defendants.             :


## MEMORANDUM OF DECISION

        This case is one of a series of lawsuits, mostly in state court, involving Blue Back Square

development in West Hartford, Connecticut.  *See, e.g.*, *W. Farms Mall, LLC v. Town of W. Hartford*,

279 Conn. 1 (2006); *Scully v. Conn. State Traffic Comm'n*, CV 05-4009413 S (Conn. Super. July 26,

2005); *Scully v. Conn. State Traffic Comm'n*, CV-06 4010524 S (Conn. Super. April 20, 2006).  In

this lawsuit, several residents of West Hartford ask the Court to order the Federal Highway

Administration ("FHWA") to conduct a review and, if appropriate, to approve proposed

modifications to the end of the Park Road exit ramp off Interstate 84 in West Hartford in the vicinity

of where Blue Back Square will be constructed.[1]  According to FHWA, in view of the limited nature

and scope of the proposed modifications, FHWA review and approval is not required.

        Currently pending before the Court are six motions: Defendants' Motion for Summary

_____

        [1]  FHWA is a part of the United States Department of Transportation, and, among other
functions, provides financial and technical support to state, local, and tribal governments for
constructing, improving, and preserving America's highway system. *See* 49 U.S.C. § 104; Complaint
[doc. # 1] at 5.

Judgment [doc. # 26] and Motion to Strike Plaintiffs' Exhibits and Attachments [doc. # 33], and

Plaintiffs' Motion for Summary Judgment [doc. # 36], Motion for Leave and to Join Additional

Defendants [doc. # 41], Motion for Temporary Restraining Order [doc. # 42], and Motion for

Preliminary Injunction [doc. # 43].  Because resolution of each motion turns to a large degree on the

Court's disposition of the cross-motions for summary judgment, the Court turns first to the summary

judgment motions following a brief recitation of the facts underlying this administrative appeal.  For

the reasons stated below, the Court DENIES Plaintiffs' Motion for Summary Judgment [doc. # 36]

and GRANTS Defendants' Motion for Summary Judgment [doc. # 26].

## I.

The Town of West Hartford, Connecticut and the Connecticut State Traffic Commission (the

"Traffic Commission"), a subdivision of the Connecticut Department of Transportation

("ConnDOT"),[2] have approved construction of a large, mixed-use development project within the

Town known as Blue Back Square.  Blue Back Square is located approximately one-half mile from

the exit ramp for the Park Road Interchange of Interstate 84 ("I-84").  Plaintiffs' Memorandum of

Law in Opposition to Defendants' Motion for Summary Judgment [doc. # 36-2] at 5 [hereinafter Pls.'

Cross-Motion].  According to Plaintiffs, two of whom live in the immediate vicinity of the proposed

development and near the Park Road Interchange, Blue Back Square will generate thousands of

additional car trips per day to the area.  *Id.*; *see* Certified Administrative Record [doc. # 27] at 80.

This, in turn, will cause traffic congestion and decreased safety on the residential streets leading from

the Park Road Interchange to Blue Back Square development.  Plaintiffs claim that they will be

---

[2] *See* Conn. Gen. Stat. § 14-298 ("There shall be within the Department of Transportation a State Traffic Commission.").

physically, aesthetically, and economically harmed by increased traffic, noise, litter, and air pollution. *See* Declaration of Barbara S. Scully [doc. # 36-10] at 2 ("We are concerned about increased noise, dust, and air pollution . . . which will directly invade our home . . . ."); Declaration of Ellen Burchill Brassil [doc. # 36-12] at 2 ("The increased traffic that will be . . . facilitated by the expansion of the I-84 interchange at Park Road . . . will . . . reduce the aesthetic and economic value of my home and its setting.").

According to Plaintiffs, on June 21, 2005, the Traffic Commission granted the application of the developer of Blue Back Square for a certificate authorizing construction and operation of the project. The certificate was conditioned on, among other requirements, the addition of a single right turn lane at the bottom of the exit ramp of the Park Road Interchange. *See* Pls.' Cross-Motion [doc. # 36-2] at 5-6. Amicus Curiae Blue Back Square, LLC describes the construction contemplated by this requirement as follows:

> The improvement to the I-84 off ramp that the State Transportation Commission has required [Blue Back Square] to make involves widening the exit ramp from Park Road approximately 400 feet toward the highway. On the first 150 feet, an additional 10-12 feet will be added to the ramp. For the next 250 feet, the widening is scaled down to 0 feet. That additional pavement plus restriping will allow the addition of a second right turn lane at the end of the off-ramp. The ramp itself, however, will be unchanged for at least several hundred feet between the end of the widening and the actual exit from the interstate highway.

Memorandum of Amicus Curiae Blue Back Square, LLC in Opposition to Plaintiffs' Motion for Leave to Amend Their Complaint and Join Additional Parties [doc. # 48] at 4 n.3.[3] The portion of

---

[3] While the Court must limit itself to the Certified Administrative Record [doc. # 27] in considering FHWA's decision that the proposed modification to the Park Road Interchange exit ramp did not require federal approval, the Court must take judicial notice of the extent of the proposed modification itself in order to rule on Plaintiffs' Motion for a Temporary Restraining Order [doc. # 42] and Motion for Preliminary Injunction [doc. # 43]. The Court additionally looks to this information as general background information that clarifies the administrative record in assessing

the ramp on which the work will occur is designated as a state road.

No work will actually occur on I-84 or on the portion of the ramp that directly connects to I-84. *See* Certified Admin. R. [doc. # 27] at 115 ("Based on this project's current status at [the Traffic Commission], [ConnDOT] has determined that impacts associated with Blue Back Square development will not be of sufficient magnitude to require modifications to any major component(s) of the interstate system. [ConnDOT] has determined development related traffic impacts are sufficient to require improvements at the [state road] 501 (I-84) ramps / Park Road Intersection, the Interchange 43 touchdown point."); *id.* at 126 ("The proposed 'modification', an addition of a right-turn lane, to the I-84 Park Road Interchange 43 off-ramp occurs at the local end of the ramp . . . ."). All relevant construction costs for the ramp modifications will be borne by the private developer of Blue Back Square and by the Town. *See* Blue Back Square's Memorandum of Law in Support of Motion to Intervene [doc. # 13-2] at 1 ("To finance BBS, the Town has issued $48.8 million in general obligation bonds for public improvements, and Private Developers will provide $110 million in private funds."). No federal funds will be spent on the modifications, which when completed will

Plaintiffs' claim that FHWA has unlawfully withheld agency action. *See, e.g.*, *Buffalo Cent. Terminal v. United States*, 886 F. Supp. 1031, 1045-46 (W.D.N.Y. 1995) ("[T]he court is permitted to go outside of the administrative record to consider background evidence to clarify the information before the agency at the time of its decision."); *Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1292 (9th Cir. 1977) ("[I]n the often difficult task of reviewing administrative regulations, the courts are not straightjacketed to the original record . . . . Here, the augmenting materials were merely explanatory of the original record. . . . [T]he augmenting materials clarified a dispute that . . . was less than clear from the original record and were clearly admissible."); *Nat'l Steel Corp., Great Lakes Div. v. U.S. Coast Guard*, 995 F. Supp. 773, 777 (E.D. Mich. 1997) ("Consideration of material outside of the administrative record is also permitted 'as either background information to aid the court's understanding, or to determine if the agency examined all relevant factors or adequately explained its decision.'") (quoting *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1428 (6th Cir. 1991)). Notably, no party has contested this description of the modification proposed to the exit ramp of the Park Road Interchange, and the administrative record reveals that FHWA was generally aware of the nature of the proposed modification. *See* Certified Admin. R. [doc. # 27] at 126.

4

provide two right turn lanes at the bottom of the exit ramp where it intersects with Park Road.

On June 3, 2005, Plaintiffs, through their legal counsel, sent a letter to Defendant Bradley Keazer, the Division Administrator for the Connecticut Division of FHWA, and Cindy Burbank, the Associate Administrator of FHWA Office of Planning, Environment, and Realty Personnel Listing. *See* Pls.' Statement of Add'l Material Facts Not in Dispute [doc. # 36] at 32, ¶ 4. Plaintiffs' letter included a safety study (performed by an engineering firm retained by their counsel) that discussed the proposed modifications to the Park Road Interchange and other alleged effects of Blue Back Square's construction. According to Plaintiffs, the additional traffic volume created by Blue Back Square would cause the "failure of the I-84 off-ramp . . . at Park Road" unless additional steps (beyond the mere addition of a right turn lane) were undertaken. *See* Certified Admin. R. [doc. # 27] at 71. Plaintiffs claimed that the proposed modification to the exit ramp required FHWA approval and compliance with both the Federal-Aid Highway Act (the "Highway Act"), 23 U.S.C. § 111, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332. To that end, Plaintiffs asked FHWA to:

> notify the Town and/or the developers of Blue Back Square, directly or through the STC-ConnDOT, that no construction activities should occur until the proper application by ConnDOT, adequately supported with respect to the reality of its effects, has been made to the FHWA to permit changes to I-84 and the FHWA has complied with the Federal Aid Highway Act . . . and the National Environmental Policy Act (NEPA).

Certified Admin. R. [doc. # 27] at 69.

FHWA "reviewed the demand letter and its enclosures, reviewed background material regarding that portion of I-84, assigned the matter for further research, solicited state input, applied its policy to the facts as set forth in the demand letter" and responded to the Plaintiffs with a letter

5

dated June 23, 2005, "which went through two levels of supervisory review and revision." Defendants' Memorandum in Support of Summary Judgment [doc. # 26-2] at 7-8 (citation omitted);[4] *see generally* Certified Admin. R. [doc. # 27] at 115-38. In its letter of response, FHWA informed Plaintiffs that the procedures for modifications to interstate access were set forth in a joint policy document ("Joint Policy") adopted by the Connecticut Division of FHWA and ConnDOT, a copy of which FHWA enclosed.

The Joint Policy, labeled "Policy and Procedures for New or Revised Interstate Access Approval in Connecticut," Certified Admin. R. at 9, was developed in April 1998 in order to "improve the existing FHWA/ConnDOT Interstate Access Modification Approval Process," *id.* at 13, by "establish[ing]," among other things, "a clear explanation of what types of improvements require approval from FHWA, as well as those types of improvements which do not specifically require FHWA approval," *id.* at 14. The Joint Policy lists those modifications that require FHWA approval and describes the information FHWA needs to complete its review and approval process. *See id.* at 18-19, 24-29. In addition, the Joint Policy sets forth a number of modifications that FHWA determined did not require its approval. Among them is "[t]he addition of left turn storage lanes, right turn storage lanes, and through travel lanes at the local road end of ramps." *Id.* at 19. The Joint Policy explains that "[t]hese additions will inherently and expeditiously increase ramp safety for ramps which chronically back-up onto the mainline Interstate travel lanes, by shortening the queue lengths and minimizing the occurrence of high speed rear-end collisions." *Id.*

FHWA's June 2005 letter to Plaintiffs included quotations from the Joint Policy regarding

---

[4]   FHWA headquarters responded to Plaintiffs' letter by informing them that through appropriate delegations of authority, Mr. Keazer, the Division Director, had responsibility for modifications and would respond to Plaintiffs' letter. *See* Certified Admin. R. [doc. # 27] at 125.

the addition of right-turn storage lanes.  Finding that the changes proposed to the bottom of the exit ramp at the Park Road Interchange fell within the ambit of this proviso, the letter informed Plaintiffs that FHWA approval was not needed for the proposed modifications.  It is clear from the letter that FHWA did not intend at that time to take any further action with respect to the proposed changes. Certified Admin. R. [doc. # 27] at 138 (quoting "Policy and Procedures for New or Revised Interstate Access Approval in Connecticut," *id.* at 19).

On July 26, 2005, Plaintiffs filed this action.  *See* Compl. [doc. # 1].  Count One is brought pursuant to the Administrative Procedures Act (APA), 5 U.S.C. § 706(1).  Count One asserts that FHWA is required by the Highway Act – specifically, 23 U.S.C. § 111 –  to approve the proposed modifications to the exit ramp at the Park Road Interchange and that FHWA is unlawfully withholding agency action that is required by law under the Highway Act.  Count Two contends that the Joint Policy is unlawful and void because, among other things, it illegally delegates to ConnDOT FHWA's duty to approve each "change in access control" under 23 U.S.C. § 111, 23 C.F.R. § 620.203, and 63 Fed. Reg. 7045 (1998).  Count Three alleges that FHWA acted arbitrarily and capriciously by deciding that the proposed modification did not require its approval. Count Four claims that FHWA's actions violate NEPA.  Among other relief requested, Plaintiffs ask the Court for an order (1) directing FHWA to comply with NEPA, the Highway Act, and associated regulations and (2) requiring FHWA to prevent the Traffic Commission and ConnDOT from granting any authorizations for construction of any improvements to the Park Road Interchange until there has been compliance with NEPA and the Highway Act.

FHWA counters with the following defenses: (1) Plaintiffs lack standing to bring these actions; (2) the challenged letter correspondence between Plaintiffs and FHWA is not a "final federal

7

action" and therefore is not reviewable; (3) there was no illegal failure to act because in issuing the Joint Policy, FHWA lawfully exercised its discretion to interpret the Highway Act and regulations adopted under it; (4) FHWA's conclusion that the Joint Policy applied in the circumstances of this case was neither arbitrary nor capricious; (5) FHWA did not delegate any decision-making to ConnDOT, but instead made a categorical decision itself that it need not approve the addition of right-turn lanes to the local end of interstate highway exit ramps, as proposed in this case; and (6) there was no NEPA violation because NEPA had not been triggered by any action or inaction on the part of FHWA. *See* Defs.' Mem. in Supp. of Mot. for Summ. J. [doc. 26-2] at 26-29.

After filing of the Certified Administrative Record [doc. # 27], submission of briefing on the cross-motions for summary judgment, and about a month before argument on the pending motions, Plaintiffs sought to amend their Complaint [doc. # 1] to add ConnDOT and its Commissioner as defendants. *See* Motion for Leave and to Join Additional Defendants [doc. # 41]. The stated purpose of Plaintiffs' joinder motion was to obtain a preliminary injunction against ConnDOT preventing any work on the proposed modifications to the Park Road Interchange pending disposition of the cross-motions for summary judgment. *See* Mot. for a TRO [doc. # 42]; Mot. for Prelim. Inj. [doc. # 43]. Given assurances that no work would commence on the modifications until after the summary judgment oral argument, the Court deferred consideration of the motion for joinder and motions for a temporary restraining order and preliminary injunction. Following argument on August 31, 2006, Amicus Curiae Blue Back Square, LLC informed the Court that "no construction work will take place on State Route 501 (referred to by counsel for plaintiffs as the exit ramp) during the month of September," by which time the Court assured the parties it would rule on their cross-motions for summary judgment. *See* Statement Concerning Construction Schedule [doc.

# 52] at 1.

## II.

The summary judgment standard is a familiar one.  Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(b).  A genuine issue of fact exists when "a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'"  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must draw all ambiguities and inferences in favor of the non-moving party, *see Anderson*, 477 U.S. at 255.  Nonetheless, "a plaintiff must provide more than conclusory allegations . . . to defeat a motion for summary judgment."  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50.  When, as here, a court considers cross-motions for summary judgment, the court applies the same legal principles and "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.  Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir. 2004) (citations omitted).

## A.

Standing is a threshold issue that a court must resolve, for if a party cannot demonstrate that

9

it has standing to bring a claim, the party may not be "entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S. 737, 752 (1984). There are two components to the standing inquiry: Article III standing and prudential standing. Article III standing requires a plaintiff to establish: "(1) personal injury or threat of injury; (2) that the injury fairly can be traced to the action challenged; and (3) that the injury is likely to be redressed by the requested relief." *Heldman v. Sobol*, 962 F.2d 148, 152 (2d Cir. 1992). Prudential standing, in suits brought under the APA, requires that a party's claim be within the "zone of interests" protected by the particular statute giving rise to the party's APA claim. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *see also Wilderness Soc. v. Griles*, 824 F.2d 4, 10-11 (D.C. Cir. 1987) (holding that, in claims arising under the APA, plaintiffs must show that "'the challenged action has caused them injury in fact' and that the injury is 'to an interest arguably within the zone of interests to be protected or regulated by the statutes that the agencies were claimed to have violated'") (quoting *Sierra Club v. Morton*, 405 U.S. 727, 733 (1972)).

The Court has serious concerns about whether Plaintiffs can establish standing to pursue their APA claims founded on alleged violations of the Highway Act and regulations and policy statements issued under the Highway Act. Among other reasons, because the purpose of the Highway Act is to improve the interstate highway system in order "to meet the needs of local and interstate commerce, for the national and civil defense," *see* 23 U.S.C. § 101(b), it is not at all clear to the Court that Plaintiffs fall within the zone of interests protected by the Highway Act. For example, in *Stewart Park and Reserve Coalition, Inc. v. Slater*, 352 F.3d 545 (2d Cir. 2003) (*SPARC II*), "a coalition of organizations and individuals representing over one million members who are sportsmen, bicyclists, hikers, bikers, birders, horseback riders, and others" who regularly used lands

that would be affected by a project that would provide access to Stewart International Airport from I-84, *id.* at 552, asserted that FHWA had violated 23 U.S.C. § 111 by, among other things, approving certain modifications to an I-84 interchange, *see Sparc II*, 352 F.3d at 561. However, the Second Circuit held that "[p]laintiffs have failed to demonstrate that they have standing to assert a claim pursuant to § 111." *Id.* at 561. In support of that statement, the Second Circuit cited with approval the Fourth Circuit's decision in *Taubman Realty Group Ltd. P'ship. v. Mineta*, 320 F.3d 475, 481 (4th Cir. 2003) (*Taubman II*), which the Second Circuit described as holding that the purpose of the Highway Act was to improve the interstate highway system in order to meet the needs of local and interstate commerce. The Second Circuit then concluded that, since the environmental, recreational, and sporting groups were not within the zone of interests protected by § 111, they therefore lacked standing to assert a claim under § 111.

While Plaintiffs contend that *SPARC II* and *Taubman II* were animated solely by the courts' concerns regarding associational standing, that is not at all clear. Happily, however, the Court need not resolve that issue. For in this case, all parties conceded at oral argument – properly, in the Court's view – that Plaintiffs do have standing to bring their NEPA claim under the APA. *See, e.g.*, *Nat'l Wildlife Fed'n*, 497 U.S. at 886 ("We have no doubt that recreational use and aesthetic enjoyment are among the *sorts* of interests [that NEPA was] specifically designed to protect.") (internal quotation omitted); *Davis v. Mineta*, 302 F.3d 1104, 1114 (10th Cir. 2002) ("In mandating compliance with NEPA's procedural requirements as a means of safeguarding against environmental harms, Congress has presumptively determined that the failure to comply with NEPA has detrimental consequences for the environment.") (citing 42 U.S.C. § 4321); *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448 (10th Cir. 1996) ("[B]ecause the Committee seeks to protect its

11

recreational, aesthetic, and consumptive interests in the land and water surrounding their village, their alleged injuries fall within the 'zone of interests' that the National Environmental Policy Act was designed to protect.").  In addition, all parties acknowledge that the central issue for resolution under Plaintiffs' NEPA and Highway Act claims is identical – namely, whether FHWA was required under federal law to take any specific action to approve the proposed modifications at issue.  Because Plaintiffs have standing to pursue their NEPA claim and because the Court must resolve the issue of required agency action under either of Plaintiffs' claims, the Court need not, and expressly does not, decide whether Plaintiffs would independently have standing to assert a Highway Act claim under the APA.

## B.

This case does not involve allegations of agency *action* so much as agency *inaction*.  FHWA has informed Plaintiffs that it does not intend to take any further action regarding the planned addition of the right-turn lane at the end of the exit ramp of the Park Road Interchange, because pursuant to the Joint Policy with ConnDOT, FHWA approval is not needed for "the addition of left turn storage lanes, right turn storage lanes, and through travel lanes at the local road end of ramps." Certified Admin. R. [doc. # 27] at 138 (quoting Joint Policy, *id.* at 19).[5]  As the Supreme Court recently emphasized, "[f]ailures to act are sometimes remediable under the APA, but not always."

---

[5]  The APA enables a court to review only "final" federal actions. *See* 5 U.S.C. § 704.  Here, FHWA has decided, at least on the basis of the current record, that it need not take any action regarding the modifications to the Park Road Interchange that are contemplated by the Traffic Commission and the developer of Blue Back Square.   Accordingly, under the APA, the Court can review FHWA's decision not to take action to approve the proposed modifications. *See, e.g.*, *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62-63 (2004); *Thompson v. U.S. Dep't of HUD*, Civ. A. MJG-95-309, 2006 WL 581260, at *3 (D. Md. Jan. 10, 2006) ("If an agency fails to act, that failure may be reviewed under section 706(1) . . . .").

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 61 (2004).

The APA provides relief for an agency's failure to act in 5 U.S.C. § 706(1).  That section states that "[t]he reviewing court shall – compel agency action unlawfully withheld or unreasonably delayed . . . ."  In construing that provision in *Norton*, the Supreme Court held that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton*, 542 U.S. at 64.  The Supreme Court noted, "[t]he limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law (which includes, of course, agency regulations that have the force of law)."  *Id.* at 65.  The Court further explained that the "principal purpose of the APA "limitations . . . is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."  *Id*. at 66.

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved – which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

*Id.* at 66-67.

Thus, the Court's task in this case is limited to determining whether FHWA was *required* by any federal law to take some *discrete agency action* that it failed to undertake.  Plaintiffs contend that three sources of federal law require FHWA to approve the addition of a right-turn lane to the bottom of the exit ramp at the Park Road Interchange:  (1) 23 U.S.C. § 111; (2) 23 C.F.R. § 620.203; and (3) 63 Fed. Reg. 7045.  The Court disagrees.  None of these provisions *requires* FHWA to

approve the specific modifications involved in this case.

      **1.**      **23 U.S.C. § 111.**     Section 111 of Title 23 of the United States Code is entitled "Agreements relating to use of and access to rights-of-way – Interstate System."  According to that provision,

> [a]ll agreements between the Secretary and the State transportation department for the construction of projects on the Interstate System shall contain a clause providing that the State will not add any points of access to, or exit from, the project in addition to those approved by the Secretary in the plans for such project, without the prior approval of the Secretary.

23 U.S.C. § 111(a).  The statute does not offer a definition of "points of access," either within § 111 or within the statute's definition section, *see* 23 U.S.C. § 101, and the phrase is not used elsewhere in the Highway Act.  Plaintiffs argue that this phrase must be read literally to require FHWA to approve *any* modifications to the entryways or exit ramps connecting to an interstate highway.  *See* Pls.' Cross-Motion [doc. # 36-2] at 18, 23-24.  FHWA responds that the phrase "add any points of access" in § 111 does not encompass the mere addition of a turning lane to the local road terminus at the bottom of an existing exit ramp.  *See* Defs.' Mem. in Supp. of Mot. For Summ. J. [doc. # 26-2] at 9-11, 28.  As thus construed, FHWA argues, the Joint Policy does not offend the statute, and FHWA approval is not required by the Highway Act for the modifications proposed in this case.

      "It is axiomatic that statutory interpretation begins with the language of the statute, and that the ordinary meaning of that language accurately expresses the legislative purpose.  Where the text of a statute is unambiguous, judicial inquiry ends . . . ."  *United States v. Lucien*, 347 F.3d 45, 51 (2d Cir. 2003) (internal quotation and citations omitted); *see Natural Res. Def. Council v. Abraham*, 355 F.3d 179, 198 (2d Cir. 2004) ("'When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress

has directly spoken to the precise question at issue.'") (quoting *Chevron v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)).[6]  Therefore, in assessing FHWA's interpretation of 23 U.S.C. § 111, the Court must first determine whether the statutory language is unambiguous, and if so, whether FHWA's interpretation conflicts with that unambiguous meaning.

Most of the cases arising under § 111 have involved proposals to add a new exit or entryway connecting to an interstate, and the language of § 111 most naturally applies to that situation.  *See, e.g.*, *SPARC II*, 352 F.3d at 552 n.4 ("[T]he preferred design involves: (1) a new diamond interchange at I-84 and Drury Lane at the existing Drury Lane overpass . . . .") (internal quotation omitted); *West v. Sec'y of DOT*, 206 F.3d 920, 923 (9th Cir. 2000) ("In December 1995, the FHWA, which must approve the construction of new access points on the interstate highway system, granted preliminary approval for the new interchange . . . ."); *Taubman Realty Group L.P. v. Mineta*, 198 F. Supp. 2d 744, 749 (E.D. Va. 2002) (*Taubman I*) ("[T]he Amended Complaint alleges that the County intended the traffic failures to force the construction of an additional interchange on I-64 at the proposed extension of Gayton Road to alleviate the traffic problems.") (internal quotation omitted).  The Court need not in this case determine the precise scope of the modifications that require federal approval under § 111, because it is clear to the Court from the plain language of the statute that a

---

[6]  Only in "rare and exceptional circumstances" can a court look beyond the plain meaning of the unambiguous statutory language to legislative history, and only then upon "the most extraordinary showing of contrary intentions."  *Lucien*, 347 F.3d at 51 (internal quotation omitted); *see Natural Resources Def. Council*, 355 F.3d at 198 ("In interpreting the plain language of the statute, we must look to the particular statutory language at issue, as well as the language and design of the statute as a whole, and, where appropriate, its legislative history.") (internal quotation omitted); *id.* at 198-99 ("If these indicators demonstrate that Congress has spoken to the question at issue, the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.") (internal quotation omitted).  Plaintiffs have not argued that this case is that "rare and exceptional" situation, and no party has directed the Court to any legislative history bearing on congressional intent in adopting the language of § 111.

proposal to merely add another right-turn lane at the bottom of the local end of a lengthy interstate exit ramp is not a proposal to "add . . . [a] point[] of access to, or exit from, the project."  23 U.S.C. § 111.  *See Stewart Park and Reserve Coalition, Inc. v. Slater*, 225 F. Supp. 2d 219, 235 (N.D.N.Y. 2002) (*SPARC I*) ("With respect to the I-84 and I-87 interchange, the project is reconstruction of an existing interchange, therefore, section 111 and its related regulations do not apply.").

Indeed, no point of access or exit is being added to or from I-84 as a result of the proposed modifications; instead, the modifications will merely widen the terminus point of the ramp where it connects with the local road.  Had Congress intended § 111 to apply to any modification of any kind or scope to an existing entry or exit ramp connecting to an interstate, it could, and presumably would have, said so.  Congress did not, and the Court would have to rewrite § 111 to construe it in the manner suggested by Plaintiffs.  That this Court will not do.  *See, e.g.*, *Cervantes-Ascencio v. INS*, 326 F.3d 83, 86 (2d Cir. 2003) ("Because we find no ambiguity or other indication that Congress intended Subpart II to mean other than what it plainly says, we decline Petitioner's invitation to rewrite the statute."); *Bastek v. Fed. Crop Ins. Corp.*, 145 F.3d 90, 94 (2d Cir. 1998) ("Faced with unambiguous statutory language . . . 'we are not free to rewrite the statutory text.'") (quoting *McNeil v. United States*, 508 U.S. 106, 111 (1993)).

Moreover, the Court notes that the overall structure of the Highway Act is focused on the federal funding of state-run projects.  *See, e.g.*, 23 U.S.C. § 114 ("The construction of any Federal-aid highway or a portion of a Federal-aid highway shall be undertaken by the respective State transportation departments or under their direct supervision. . . .  The construction work and labor in each State shall be performed under the direct supervision of the State transportation department . . . ."); 23 U.S.C. § 116(a) ("It shall be the duty of the State transportation department

16

to maintain, or cause to be maintained, any project constructed under the provisions of this chapter . . . ."); 23 U.S.C. § 145(a) ("The provisions of this chapter . . . provide for a federally assisted *State program*.") (emphasis added).  Therefore, the statute contemplates extensive state involvement and oversight in the maintenance of the federal highway system.  Interpreting § 111 to allow the minor modification to the local end of an interstate highway exit ramp without invoking the burden and expense of the formal federal approval process is consistent with the overall structure of the Highway Act.

Since the Joint Policy does not conflict with the plain meaning of 23 U.S.C. § 111, and since the statute is unambiguous on its face, the Court need not employ any deference – *Chevron*-type or otherwise – to the agency's interpretation of 23 U.S.C. § 111 under the Joint Policy.  Under a plain meaning analysis, § 111 simply does not impose any requirement upon FHWA to approve the  I-84 off-ramp modification involved in this case.

2.      **23 C.F.R. § 620.203.**      The Plaintiffs next invoke a regulation with the force of law – 23 C.F.R. § 620.203 – to support their claim that FHWA was required to approve the off-ramp modification at the Park Road Interchange.  The Supreme Court made it clear in *Norton* that a regulation with the force of law could provide the federal requirement needed to support a claim under 5 U.S.C. § 706(1).  *See Norton*, 542 U.S. at 64.

Section 620.203 states that "relinquishment of the right-of-way or *any change made in control of access* shall be in accordance with the provisions of this section. . . .  No change may be made in control of access, without the joint determination and approval of the SHA and FHWA."  23 C.F.R. § 620.203(a), (h) (emphasis added).  Plaintiffs argue that this provision construes 23 U.S.C. § 111 to require FHWA approval for any change in control of access to an interstate and that

17

the addition of the right-turn lane at issue here will effectuate such a change in control.  Section 620.203 therefore requires FHWA to approve the modification in this case.

Plaintiffs' reliance on this regulation is misplaced for two reasons.  First, 23 C.F.R. § 201 declares that the purpose of the subpart, which includes § 620.203, is "[t]o prescribe Federal Highway Administration (FHWA) procedures relating to relinquishment of highway facilities."  In addition, 23 C.F.R. § 620.202 reaffirms this limitation by explicitly stating that "[t]he provisions of this subpart apply *only* to relinquishment of facilities for continued highway purposes.  Other real property disposals and modifications or disposal of access rights are governed by the requirements of 23 CFR part 710."  23 C.F.R. § 620.202 (emphasis added).  In fact, the subpart that includes § 620.203 is expressly labeled, "Relinquishment of Highway Facilities."  Therefore, 23 C.F.R. § 620.203, as part of the subpart referenced in § 620.202, applies only to "the relinquishment of facilities for continued highway purposes," and not to modifications of highway exit ramps.

Moreover, Plaintiffs can point to no evidence that § 620.203 was adopted in order to interpret 23 U.S.C. § 111, as they claim in their briefs.  In fact, when notice of adoption of the regulation was first published in the *Federal Register*, the release specifically stated that the subpart would be adopted under the authority of "23 U.S.C. 315; 49 CFR 1.48; 23 CFR 1.32."  *See* 39 Fed. Reg. 33311.  No mention was made of 23 U.S.C. § 111.  Moreover, the final rule that modified the subpart containing 23 C.F.R. § 620.203 in 1999 also stated that "Part 620 is amended to clarify that it is applicable *only* to transfers of highway facilities for continued highway use."  *See* 64 Fed. Reg. 71284, 71286 (emphasis added).  That rule also stated that "[t]he authority citation for part 620 continues to read as follows: Authority: 23 U.S.C. § 315 and 318; 49 CFR 1.48; and 23 CFR 1.32."  64 Fed. Reg. 71289.  Because this case does not involve a relinquishment of facilities for continued

18

highway purposes and because 23 C.F.R. § 620.203(h) is expressly limited to those circumstances, § 620.203 does not require FHWA to approve the modifications proposed in this case.

Second, even if the Court were inclined (which it is not) to ignore §§ 620.201-202 and to apply § 620.203 outside the context of a relinquishment of facilities for continued highway purposes, the provision merely states that "[n]o change may be made in control of access, without the joint determination and approval of the SHA and FWHA." 23 C.F.R. § 620.203(h). The phrase "control of access" appears to denote a change in who controls access to the interstate, and that is not at issue here. The modification at issue in this case occurs at the local end of the exit ramp and extends for approximately 400 feet toward the highway entrance, but "[t]he ramp itself . . . will be unchanged for at least several hundred feet between the end of the widening and the actual exit from the interstate highway." Blue Back Square's Mem. in Opp'n to Pls.' Mot. For Leave [doc. # 48] at 4 n.3. This modification does not appear to affect the "control of access" to the highway itself, and so does not offend the plain language of the regulation. *See, e.g.*, *Alexandria v. Fed. Highway Admin.*, 756 F.2d 1014, 1019 (4th Cir. 1985) ("The environmental regulations themselves do not define access control, but FHWA's general definitions adopt the industry definition promulgated by the American Association of State Highway and Transportation Officials, and that definition refers to physical changes in control as to abutting landowners, not to changes in the pattern of use by the highway traffic itself.") (citation omitted); *id.* at 1019 n.4 ("Access control is defined in both adopted documents as: The condition where the right of owners or occupants of abutting land or other persons to access, light, air or view in connection with a highway is fully or partially controlled by public authority."); *West*, 206 F.3d at 929 n.9 ("[W]hen 'access control' is used elsewhere in FHWA regulations, it appears to relate generally to right-of-way related issues. *See, e.g.*, 23 C.F.R.

19

§ 620.203(d),(f)(procedures for relinquishing facilities) . . . .").  In sum, neither the statute nor the regulation by its plain language or terms requires FHWA approval of the modification proposed here.

      **3.**      **63 Fed. Reg. 7045 (1998).**      Plaintiffs finally point to FHWA's statement of policy, found at 63 Fed. Reg. 7045, as a source of federal authority that requires FHWA to  approve the Park Road Interchange modifications.  The policy statement, by its terms, relates to "requests for added access to the existing Interstate system."  *Id.*  The policy statement discusses 23 U.S.C. § 111 and FHWA's responsibilities under that provision and "includes guidance for the justification and documentation needed for requests to add access (interchanges and ramps) to the existing Interstate System."  *Id.*  The statement sets forth eight requirements that "new or revised access points to the existing Interstate System should meet . . . ."  *Id.* at 7046.  The eight requirements are as follows:

    1. The existing interchanges and/or local roads and streets in the corridor can neither provide the necessary access nor be improved to satisfactorily accommodate the design-year traffic demands while at the same time providing the access intended by the proposal.

    2. All reasonable alternatives for design options, location and transportation system management type improvements (such as ramp metering, mass transit, and HOV facilities) have been assessed and provided for if currently justified, or provisions are included for accommodating such facilities if a future need is identified.

    3. The proposed access point does not have a significant adverse impact on the safety and operation of the Interstate facility based on an analysis of current and future traffic.  The operational analysis for existing conditions shall, particularly in urbanized areas, include an analysis of sections of Interstate to and including at least the first adjacent existing or proposed interchange on either side. Crossroads and other roads and streets shall be included in the analysis to the extent necessary to assure their ability to collect and distribute traffic to and from the interchange with new or revised access points.

    4. The proposed access connects to a public road only and will provide for all traffic movements.  Less than "full interchanges" for special purpose access for transit vehicles, for HOV's, or into park and ride lots may be considered on a case-by-case basis.  The proposed access will be designed to meet or exceed current standards for

Federal-aid projects on the Interstate System.

5. The proposal considers and is consistent with local and regional land use and transportation plans. Prior to final approval, all requests for new or revised access must be consistent with the metropolitan and/or statewide transportation plan, as appropriate, the applicable provisions of 23 CFR part 450 and the transportation conformity requirements of 40 CFR parts 51 and 93.

6. In areas where the potential exists for future multiple interchange additions, all requests for new or revised access are supported by a comprehensive Interstate network study with recommendations that address all proposed and desired access within the context of a long-term plan.

7. The request for a new or revised access generated by new or expanded development demonstrates appropriate coordination between the development and related or otherwise required transportation system improvements.

8. The request for new or revised access contains information relative to the planning requirements and the status of the environmental processing of the proposal.

*Id.* By its terms, the policy statement applies to "new or revised access points to existing Interstate facilities regardless of the funding of the original construction or regardless of the funding for the new access points." *Id.* Plaintiffs assert that the modifications to the exit ramp at the Park Road Interchange create a "revised access point" which must satisfy the eight requirements of 63 Fed. Reg. 7045, and that those requirements have not been met.

At the outset, two aspects of 63 Fed. Reg. 7045 are worthy of note. First, nowhere does this policy statement refer to 23 C.F.R. § 620.203, thus confirming the Court's view that § 620.203 does not apply to modifications of access control outside the context of relinquishment of highway facilities. Second, 63 Fed. Reg. 7045 is expressly labeled a "Notice of Policy Statement" and, unlike a statute or a regulation, it does not carry the force and effect of law. *See, e.g., De La Mota v. U.S. Dep't of Educ.*, 412 F.3d 71, 79 (2d Cir. 2004) ("[I]nterpretations contained in policy statements, agency manuals and enforcement guidelines, all of which lack the force of law - do not warrant

21

*Chevron* style deference.") (internal quotation omitted); *N.Y. City Employees' Ret. Sys. v. SEC*, 45 F.3d 7, 12 (2d Cir. 1995) ("Since they only clarify existing law, interpretive rules need not go through notice and comment.  These rules do not have force of law, though they are entitled to deference from the courts.") (citation omitted).  *But see Huberman v. Perales*, 884 F.2d 62, 68 (2d Cir. 1989) ("It is of great import that the Secretary labeled the regulations interpretative when he issued them. . . .  Of course, the Secretary's label does not bind us.").  Indeed, the policy statement invoked by the Plaintiffs did not even proceed through the formal notice and comment procedure provided by the APA.[7]

It is not at all clear, therefore, whether such a policy statement could alone serve as the basis for the Supreme Court's insistence in *Norton* that a requested agency action (such as the FWHA approval sought here) be *required* by federal law.  As the Fourth Circuit stated in *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 (4th Cir. 1995), "the exemption [from formal notice-and-comment procedure] for general policy statements allows agencies to announce their tentative intentions for the future without binding themselves."  *Cf. Sweet v. Sheahan*, 235 F.3d 80, 91 (2d Cir. 2000) ("Interpretive rules and legislative rules differ in important ways. Legislative rules bind members of the agency and the public, and such rules receive substantial deference from the courts.").  *But see, e.g.*, *Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d 992, 995 (D.C. Cir. 1990) ("CCNV contends that the Park Service's rejection of its sculpture was contrary to the standards set out in the

---

[7]An earlier version of the policy statement was adopted according to formal APA notice and comment procedure in 1990.  *See* 55 Fed. Reg. 42670 (Oct. 22, 1990).  However, the 1998 version – which was not adopted pursuant to formal APA rule-making procedure – "issue[d] a revision of the FHWA policy statement regarding requests for added access to the existing Interstate system. . . . [to] [t]he policy statement . . . originally issued in the Federal Register on October 22, 1990 (55 FR 42670)."  63 Fed. Reg. 7045-46.

Policy Statement, and thus should be set aside as arbitrary and capricious under the Administrative Procedure Act. 'We must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'") (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (internal quotation and citation omitted).  Finally, the 1998 policy statement revises the 1990 policy statement in such a way as to make the list of factors to be considered in granting approval hortatory rather than compulsory. *Compare* 63 Fed. Reg. 7046 (stating that "new or revised access points to the existing Interstate System *should meet* the following requirements") (emphasis added); *with* 55 Fed. Reg. 42672 (stating that "new or revised access points to the existing Interstate System *will be considered for approval only if*") (emphasis added).

The Court, however, need not decide whether FHWA's policy statement sets forth a "*discrete* agency action that [FHWA] is *required* to take," *see Norton*, 542 U.S. at 64, because even assuming that it does, the Court nonetheless concludes that the policy statement does not *require* FHWA approval of the modifications involved in this case.  The Court reaches this conclusion for two main reasons.

First, by its plain terms, the policy statement does not on its face apply to the modifications at issue here.  The policy statement expressly applies only to "new or revised access points to the existing Interstate System."  63 Fed. Reg. 7046.  The Court has already explained that this case does not involve a new access point, and so Plaintiffs seek refuge in the word "revised."  But the policy statement itself states that "[f]or the purpose of applying this policy, each entrance or exit point . . . to the *mainline* is considered to be an access point.  For example, a diamond interchange configuration has four access points."  *Id.* at 7046-47 (emphasis added).  Here, no change is proposed

to the exit point to the mainline of I-84; the proposed modifications will occur only at the terminal end of the exit ramp and will only extend a short distance, nowhere near the mainline of I-84.

More important, the policy statement goes on to define the term "revised" in a manner that does not implicate the modifications in this case.  According to the policy statement, "[g]enerally, revised access is considered to be a change in the interchange configuration even though the number of points of access may not change." *Id*. at 7047.  The policy statement then provides an example to illustrate what is meant by "a change in the interchange configuration."  "For example, replacing one of the direct ramps of a diamond interchange with a loop, or changing a cloverleaf interchange into a fully directional interchange would be considered revised access for the purpose of applying this policy." *Id*.  Adding another right-turn lane to the bottom of a single, lengthy exit ramp of an interchange does not "revise" the Park Road Interchange configuration in a manner remotely contemplated by the plain language of the policy statement.

More to the point, however, since the Court lacks any particular expertise in interchange design and approval, the Court must defer to an agency's interpretation of its own rule,  so long as that interpretation is a permissible construction of its language and does not violate the constitution or a federal statute, and as long as it is not plainly erroneous.  *See United States v. Yuzary*, 55 F.3d 47, 51 (2d Cir. 1994) ("Federal courts are bound by an agency's interpretation of its own legislative rule unless the interpretation is inconsistent with the legislative rule, violates the constitution or a federal statute, or is plainly erroneous.") (citing *Stinson v. United States*, 508 U.S. 36, 44-45 (1993)).  And when a court considers an agency's interpretation of its own non-binding policy statements, deference to the agency must be at its zenith.  For example, in *SPARC I*, the district court noted the following:

Plaintiffs contend that the FHWA violated its own policies for approval of a project that is a modification of an existing interchange. The policy Plaintiffs refer to sets forth guidelines for the approval of such projects. Since they are merely guidelines, this Court must give great deference to the FHWA in determining whether to adhere to such guidelines for this specific project.

225 F. Supp. 2d at 235 (citations omitted); *see Midwest Interstate Low-Level Radioactive Waste Comm'n v. O'Leary*, 926 F. Supp. 134, 137 (D. Minn. 1996) (To the extent that the . . . [agency] Policy Statement [is] ambiguous, the Secretary's interpretation is certainly 'based on a permissible construction.'") (citing *Chevron*, 467 U.S. at 842-43).

Here, it was neither arbitrary, nor unreasonable, nor clearly erroneous, and it certainly was permissible for the Connecticut Division of FHWA to interpret FHWA's own internal policy statement as not requiring approval of the addition of a right-turn lane. *See* Certified Admin. R. [doc. # 27] at 12 ("This report explains FHWA national policy and outlines procedures developed for applying that policy in Connecticut for new or revised Interstate access approval regardless of the funding source. This FHWA national policy was originally issued in 1990, and was revised in February 1998."). Indeed, as the Joint Policy notes, prompt addition of such turning lanes may enhance safety on interstate exit ramps in the state, and promoting "safe and rapid movement of traffic" on interstate highways was the primary reason for adopting 23 U.S.C. § 111. *See* H.R. Rep. No. 84-2022, at 14 (1956). *See* Certified Admin. R. [doc. # 27] at 19 ("These additions will inherently and expeditiously increase ramp safety for ramps which chronically back-up onto the mainline Interstate travel lanes, by shortening the queue lengths and minimizing the occurrence of high speed rear-end collisions."). Furthermore, the Joint Policy does not violate the Constitution, nor any federal statute, and it is not clearly erroneous. *See Yuzary*, 55 F.3d at 51. Therefore, the Court defers to the Connecticut Division of FHWA's construction of FHWA's policy statement and

holds that 63 Fed. Reg. 7045 does not require FHWA to approve the addition of a right-turn lane to the end of the exit ramp at the Park Road Interchange.

In an effort to show that the Connecticut Division of FHWA's construction of the federal policy statement was arbitrary and unreasonable, Plaintiffs cite a position statement of the Georgia Division of FHWA.[8]  The Georgia position statement suggests that the Georgia Division of FHWA might require federal approval for the addition of turn lanes at the end of ramps connecting to an interstate, though the Court has no information about how the Georgia Division implements its own policy statement in practice.  However, the fact that there might be regional variances in approaches is hardly surprising and is an expected result of the delegation of authority to the Regional Administrators.  *See* 55 Fed. Reg. 42670, 42672 (1990) ("The purpose of having the States and local Division offices jointly develop the detailed implementation procedures is to provide the maximum amount of flexibility to meet local conditions and procedures.").  Moreover, our federal highways have historically been within the ownership and control of the states, and thus local variations are contemplated by the federal statutory scheme.  *See, e.g.*, 23 U.S.C. § 114 ("The construction of any Federal-Aid highway or a portion of a Federal-Aid highway shall be undertaken by the respective

---

[8] Plaintiffs request that this Court consider (1) an alternative position taken by the State of Georgia, (2) certain affidavits, and (3) the Traffic Commission Certificate, none of which were before FHWA when it made its decision.  Defendants move to strike the Georgia and Traffic Commission evidence, as well as the affidavits to the extent they may be considered beyond the question of Plaintiffs' standing.  The Court DENIES Defendants' Motion [doc. # 33].  On the cross-motions for summary judgment, the Court will take judicial notice of the fact that the Georgia Division's Guidance on Interstate Access Requests (Aug. 5, 2003) provides that "[i]n accordance with 23 USC 111, *FHWA must provide approval for any modification, other than maintenance activities, to an existing interchange*." Pls.' Cross-Mot. [doc. # 36] Ex. 2 at 3, also available at http://www.fhwa.dot.gov/gadiv/interaccess.htm.  *See supra* note 3.  The Court must in any case examine the Traffic Commission Certificate and declarations as they relate to Plaintiffs' Motions for Temporary Restraining Order [doc. # 42] and Preliminary Injunction [doc. # 43].

State transportation department or under their direct supervision."); *Mahler v. United States*, 306

F.2d 713, 717 (3d Cir. 1962) ("The states are at all times the owners of the roads and are primarily

responsible for their operations."); *cf. Taubman I,* 198 F. Supp. 2d at 763 ("Congress has created a

scheme by which state officials would play a substantial and on-going role in planning and

developing the highways that run through their states.").   Therefore, even a different implementation

of 63 Fed. Reg. 7045 by the Georgia Division would not suggest that the Connecticut Division of

FHWA's construction and implementation of the policy statement is unreasonable or impermissible.

Several issues remain to be considered.  One is whether the Connecticut Division of FHWA

had authority to construe 63 Fed. Reg. 7045 as it did.  The answer is yes.  "The Secretary [of

Transportation] has delegated the authority to administer 23 U.S.C. 111 to the Federal Highway

Administrator pursuant to 49 CFR 1.48(b)(10)."  63 Fed. Reg. 7046.  By its terms, the 1998 policy

statement expressly delegated authority to FHWA to

> ensure that all requests for new or revised access submitted by the State highway
> agency for FHWA consideration contain sufficient information to allow the FHWA
> to independently evaluate the request and ensure that all pertinent factors and
> alternatives have been appropriately considered. The extent and format of the
> required justification and documentation should be developed jointly by the State
> highway agency and the FHWA to accommodate the operations of both agencies, and
> should also be consistent with the complexity and expected impact of the proposals.

63 Fed. Reg. 7047.  Although Plaintiffs argue that the authority to enter agreements dealing with

control of access was specifically reserved by the central FHWA in its delegation of authority, *see*

Pls.' Local Rule 56(a)(2) Statement [doc. # 36] at 31, ¶ 5, the re-delegation of that authority to the

Division Administrator is clear.   *See* Certified Admin. R. [doc. # 27] at 52-53 ("Regional

Administrators are delegated authority to determine acceptability of . . . requests . . . . for: . . .

modification of existing interchanges . . . . This authority may be redelegated to Division

27

Administrators."); *id.* at 53 ("Regional Administrators are delegated authority for final approval of changes in points of ingress or egress with Interstate through traffic lanes and with interchange ramps on completed sections of the Interstate System . . . .   This authority may be redelegated . . . ."); *id.* at 49-50 ("The only types of new access that now need to be referred to [the Regional FHWA office] are those that are required to be submitted to the Headquarters . . . ."); *see generally id.* at 49-55.  In exercise of its lawfully delegated power, the Connecticut Division of FHWA jointly developed with ConnDOT procedures to implement the federal policy, including a clear statement of what projects are and are not required to obtain FHWA approval under the policy, and what information the Connecticut Division of FHWA needs to complete its review of modifications that require its approval.  *See* Certified Admin. R. [doc. # 27] at 12 ("This report was developed by . . . the Federal Highway Administration (FHWA) and the Connecticut Department of Transportation (ConnDOT) . . . to streamline and clarify the existing process.").

Plaintiffs also argue that FHWA was required to follow the formal APA notice-and-comment procedure when adopting the Joint Policy.  This argument is meritless.  To understand why, remember that the Joint Policy is merely an interpretation of a FHWA policy statement that itself never underwent APA notice and comment.  It would be ironic in the extreme if the Connecticut Division of FHWA was required to go through formal notice and comment to adopt a construction of a policy statement that itself was not required to proceed through formal APA notice and comment.  In any event, there is no occasion for irony here.

Even if the Joint Policy is construed as an interpretation of both the 1990 federal policy – which did go through formal notice-and-comment procedure – and the 1998 revision, an agency must only follow the formal APA procedure when it is announcing a legislative rule, but not when

adopting an interpretive or procedural rule.  *See* 5 U.S.C. § 553(b)(A) ("Except when notice or hearing is required by statute, this subsection [regarding notice-and-comment procedure] does not apply – to interpretative rules, general statements of policy, or rules of agency organization, procedure or practice . . . ."); *N.Y. City Employees' Ret. Sys.,* 45 F.3d at 11 ("Not all agency issuances are subject to notice and comment requirements. Notice and comment are required only if the statement is (1) a rule, and (2) legislative, as opposed to interpretive."); *Natural Res. Def. Council*, 355 F.3d at 204 ("The APA generally requires that, prior to issuing a final rule, an agency should provide both notice and an opportunity for comment to the public.  The notice and comment requirements do not apply if an agency is prescribing a rule of procedure . . . .") (citations omitted). "Legislative rules are those that create new law, rights, or duties, in what amounts to a legislative act.  Interpretive rules, on the other hand, do not create rights, but merely clarify an existing statute or regulation."  *N.Y. City Employees' Ret. Sys.*, 45 F.3d at 12 (internal quotation and citation omitted).  While such interpretative rules do not carry the force of law, "they are entitled to deference from the courts."  *Id.*  The Joint Policy is, at most, an interpretive rule, and therefore formal APA notice-and-comment was not required.

The final argument advanced by Plaintiffs is that the Connecticut Division of FHWA did not sufficiently review the administrative record in deciding whether the changes slated for the Park Avenue Interchange fell within the Joint Policy, and that therefore its conclusion that the Joint Policy applied to the modifications was arbitrary and capricious.  In analyzing whether an agency's actions are arbitrary and capricious under the APA, a court may only review the administrative record before the agency at the time it acted or failed to act.  *Merritt Parkway Conservancy v. Mineta*, 424 F.Supp. 2d 396, 402-403 (D. Conn. 2006).  The materials sent by Plaintiffs to the Connecticut Division of

FHWA do not indicate that the modification at issue was something other than the addition of a right-turn lane to the bottom of an exit ramp, and such a modification falls squarely within the Joint Policy category of "no approval needed."  *See* Certified Admin. R. [doc. # 27] at 19.  FHWA analyzed the information sent to it by Plaintiffs, as is apparent from the administrative record.  *See id.* at 115-38; *see also* Defs.' Mem. in Supp. of Mot. for Summ. J. [doc. # 26-2] at 7-8.  In addition, FHWA conferred with ConnDOT while assessing whether the Joint Policy applied to the situation. *See* Certified Admin. R. [doc. # 27] at 115, 119.  Finally, FHWA was entitled to credit ConnDOT's determination of whether the project needed FHWA approval under the Joint Policy, unless FHWA was presented with evidence contrary to ConnDOT's position.  As stated above, Plaintiffs offered no such evidence.  Therefore FHWA's determination that the Joint Policy applied in this case was not arbitrary and capricious.[9]

In sum, no federal law *requires* that FHWA review and approve the *specific* modifications at issue in this case.  Accordingly, this Court cannot force FHWA, under the banner of the APA, to approve something that it is not required to approve or to reach a different decision on these matters than it has reached.  *See Norton*, 542 U.S. at 66 ("The principal purpose of the APA limitations . . . is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."); *Cmty. for Creative Non-Violence*, 908 F.2d at 996 ("The Administrative Procedure Act does not empower . . . the District Court to substitute its judgment for that of the

---

[9] The Court in reaching its decision on the APA claim has not considered any of the Traffic Commission approval documents that Plaintiffs proffered in support of their Cross-Motion [doc. # 36], because those documents are not part of the Certified Administrative Record [doc. # 27] in this case.  However, the Court notes that, even if it did consider these documents for the purposes of the summary judgment motions, they would not alter the Court's decision.

agency.").  Plaintiffs have also failed to establish that FHWA acted unlawfully, arbitrarily, or capriciously in any way.

**C.**

As counsel for Plaintiffs conceded at oral argument, since NEPA is triggered only when there has been a "major federal action" or the withholding of a "major federal action" under that statute, the fact that this Court has now determined that there was no unlawfully withheld agency action also disposes of Plaintiffs' NEPA claim.[10]  *See* 42 U.S.C. § 4332(C) (imposing "major Federal action" requirement); 40 C.F.R. § 1508.18 ("'Major Federal action' includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. . . .  Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts . . . under the Administrative Procedure Act . . . as agency action."); *Atlanta Coal. on Transp. Crisis, Inc. v. Atlanta Reg'l Comm'n*, 599 F.2d 1333, 1347 (5th Cir. 1979) ("Plans for development, whether of local, regional, or national scope, may well constitute a recommendation or report on a proposal for action. But where, as here, state and local agencies are solely responsible for the contents of the plan, the projects proposed, and the improvements recommended, and the adoption of the plan in no way obligates the federal government, the plan cannot be said to be 'federal' for the purposes of NEPA.").  Therefore, Plaintiffs' NEPA claim necessarily fails.  In so ruling, the Court

---

[10]  Defendants point out that there is no private right of action directly under NEPA.  *See, e.g.*, *Turtle Island Restoration Network v. U.S. DOC*, 438 F.3d 937, 942 (9th Cir. 2006) ("Neither NEPA nor MBTA authorize a private right of action."); *Town of Stratford v. FAA*, 285 F.3d 84, 88 (D.C. Cir. 2002) ("Since NEPA does not create a private right of action, petitioner relies on the APA . . . ."); *Noe v. Metro. Atlanta Rapid Transit Auth.*, 644 F.2d 434, 439 (5th Cir. Unit B May 1981) ("Our research has failed to disclose anything to suggest a Congressional intent to recognize an implied judicial remedy for an alleged violation of NEPA.").  The Court need not and expressly does not decide whether NEPA itself provides a private right of action, because the Court has decided on other grounds that Plaintiffs NEPA claim must fail.

31

expressly takes no position on whether, were FHWA required to take action to approve the proposed modifications, the Traffic Commission and Town approval process would constitute a "proposal" for "major federal action" under NEPA. *See Taubman I,* 198 F. Supp. 2d at 763 ("[T]he parties hotly disputed whether, absent a formal request for change in access to I-64, FHWA had any duties pursuant to NEPA that are enforceable in federal cour t. . . .   [I]t cannot be said that either the County's submission of the revised POD or the County Planning Commission's . . . approval of that POD, constitutes a 'proposal' for 'major federal action.'  Indeed, such a finding substantially would increase NEPA's reach with respect to local development and zoning matters."). *But see* Certified Admin. R.[doc. # 27] at 12 ("The FHWA approval constitutes a Federal action, and as such, requires that National Environmental Policy Act (NEPA) procedures are followed.").

## IV.

The Court's decision on the cross-motions for summary judgment necessarily decides the Plaintiffs' Motions for a Temporary Restraining Order [doc. # 42] and Preliminary Injunction [doc. # 43], since those motions only sought "to preserve the status quo . . . *until the Court has the opportunity to hear and decide the merits of plaintiffs' case*."  Mot. for TRO [doc. # 42] at 1-2 (emphasis added); Mot. for Prelim. Inj. [doc. # 43] at 1-2 (emphasis added).

Regardless of the phrasing of their motions, Plaintiffs would not in any event be entitled to preliminary injunctive relief in this case.  "In the Second Circuit, to obtain a preliminary injunction, a plaintiff must establish the following: (1) irreparable harm; and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor."  *Sequoia Sciences, Inc. v. Wood*, No. 3:05CV1908 (MRK), 2006 WL 860475, at *1 (D. Conn. Mar. 31, 2006) (citing

*Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 348-49 (2d Cir. 2003)).  "[P]reliminary injunctive relief can be awarded only upon a clear showing that the movant is entitled to the relief and . . . in making such a showing the movant bears a heavy burden."  *New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 750 (2d Cir. 1977) (citations omitted).  "[T]he balancing of hardships test . . . necessarily includes the showing of irreparable harm."  *Id.* (internal quotation and citation omitted).  "Irreparable injury is one that cannot be redressed through a monetary award."  *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990).  The law in this Circuit requires a showing that irreparable harm is likely, not merely possible.  *See id.*  Any threat of irreparable harm must be "actual and imminent."  *Nuclear Regulatory Comm'n*, 550 F.2d at 755.  Thus, the standard that Plaintiffs must meet is extremely high.  *See Harrison/Erickson, Inc. v. Chicago Bulls Ltd. P'ship*, 1991 WL 51118, at *7 (S.D.N.Y. April 3, 1991).

In view of the Court's conclusions above, Plaintiffs necessarily have no likelihood of success on the merits of their underlying motions.  And even under the alternative test for awarding a motion for a preliminary injunction, the Court does not believe that Plaintiffs can make an adequate showing, because they cannot show that the balance of hardships tips *decidedly* in their favor.  There are other weighty, local interests at stake in the development of this project.  *See, e.g.*, *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 194-95 (2d Cir. 2004) ("[T]he balance of hardships is, viewing the facts in the light most favorable to MyWeb, equal.  Both MyWeb and Hometown would suffer determinable monetary damages should they not prevail on the injunction issue. However, if a preliminary injunction were issued, D'Agostino would be forced to shut down its online grocery store, at least temporarily, perhaps permanently losing customers.") (citation omitted); *Random House Inc. v. Rosetta Books LLC*, 283 F.3d 490, 492 (2d Cir. 2002) ("For while

33

Random House expresses fears about harm to its goodwill if Rosetta is allowed to proceed with its sale of ebooks, Rosetta, whose entire business is based on the sale of ebooks, raises a reasonable concern that the proposed preliminary injunction will put it out of business or at least eliminate its business as to all authors who have executed similar contracts. As the district court found, such legitimate concerns outweigh any potential hardships to Random House, which, if it ultimately prevails on the merits, can recover money damages for any lost sales.") (citation omitted).

More important, however, the Court does not believe that Plaintiffs have established likely irreparable harm. The proposed modifications to the Park Road exit ramp are not extensive, and the changes are physically reversible, at no cost to either the federal or state fisc. *See* Certified Admin. R. [doc. # 27] at 116; Blue Back Square's Mem. of Law in Supp. of Mot. to Intervene [doc. # 13-2] at 1 ("To finance BBS, the Town has issued $48.8 million in general obligation bonds for public improvements, and Private Developers will provide $110 million in private funds."). Furthermore, the proposed modification is not so extensive in scope that allowing it to go forward "will work a major and likely irreversible change to the landscape of" the Park Road Interchange. *See Merritt Parkway*, 424 F. Supp. 2d at 425. Thus, Plaintiffs have not made a showing of irreparable harm in this case.

The Court acknowledges that some courts have held that a plaintiff can establish irreparable harm when it can demonstrate to the court that an agency will not in good faith revisit the merits of a decision previously made. However, such a situation will most likely arise where the agency itself has invested a significant amount of time, effort, money, and reputational capital in a particular, challenged result. *See, e.g.*, *Nuclear Regulatory Comm'n*, 550 F.2d at 754 ("[W]hen massive resources are committed to and are expended on a project without any forethought having been given

34

to its environmental impact, modification of that project is unlikely despite the fact that undesirable environmental consequences are disclosed by the EIS when it is ultimately drafted."); *Steubing v. Brinegar*, 511 F.2d 489, 497 (2d Cir. 1975) ("Without preliminary injunctive relief construction might well reach the stage of completion where for economic and other reasons it would be impossible to run back or alter the project in light of what an EIS revealed, and thus the environment might thereby be irreparably damaged."). That certainly is not the case here. FHWA has not engaged in substantial analysis concerning this particular modification, nor would FHWA's resources be adversely affected by an alternative modification or configuration, should that be needed. The developer and the Town are responsible for funding any changes to the exit ramp, either in modifying it initially or in restoring it to its pre-modification state. Thus, the developer and the Town are the entities that will be adversely affected if a later court finds that federal action was required, not FHWA.

Accordingly, the Court denies Plaintiffs' Motions for a Temporary Restraining Order [doc. # 42] and Preliminary Injunction [doc. # 43]. Furthermore, because Plaintiffs have sought leave to join ConnDOT and its Commissioner solely for purposes of obtaining preliminary injunctive relief, and because the Court has now denied Plaintiffs' request for injunctive relief, Plaintiffs' Motion for Leave and to Join Additional Defendants [doc. # 41] is denied as moot.

## VI. Conclusion

In sum, Plaintiffs' Motion for Summary Judgment [doc. # 36] is DENIED and Defendants' Motion for Summary Judgment [doc. # 26] is GRANTED. The Court also DENIES Plaintiffs' Motion for Temporary Restraining Order [doc. # 42] and Motion for Preliminary Injunction [doc. # 43], and DENIES AS MOOT Plaintiffs' Motion for Leave and to Join Additional Defendants [doc.

35

# 41].  Finally, the Court DENIES Defendants' Motion to Strike Plaintiffs' Exhibits and Attachments [doc. # 33].  **The Court directs the Clerk to enter judgment for Defendants and against Plaintiffs on Counts One through Four of the Complaint and to close this file.**

IT IS SO ORDERED,


/s/_____Mark R. Kravitz_____
United States District Judge


Dated at New Haven, Connecticut: **September 26, 2006.**